# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 16, 2015  Decided November 3, 2015

No. 13-1263

TREASURE STATE RESOURCE INDUSTRY ASSOCIATION,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY AND GINA
MCCARTHY, ADMINISTRATOR, U.S. ENVIRONMENTAL
PROTECTION AGENCY, RESPONDENTS

———

Consolidated with 13-1264, 14-1093, 14-1164

———

On Petitions for Review of Actions of the
United States Environmental Protection Agency

———

*William W. Mercer* argued the cause for petitioner Treasure State Resource Industry Association. *Douglas A. McWilliams* argued the cause for petitioner United States Steel Corporation. With them on the briefs were *John D. Lazzaretti*, *Emily C. Schilling*, *Marie Bradshaw Durrant*, and *Michael P. Manning*.

*Norman J. Mullen*, Special Assistant Attorney General, Office of the Attorney General for the State of Montana, was on the brief for *amicus curiae* State of Montana in support of

remedy of reversal urged by petitioner Treasure State Resource Industry Association in 13-1263 and 14-1164.

*Amanda Shafer Berman*, Attorney, U.S. Department of Justice, argued the cause for respondents. With her on the brief were *John C. Cruden*, Assistant Attorney General, and *Mike Thrift*, Counsel, U.S. Environmental Protection Agency.

Before: GRIFFITH and MILLETT, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: The Clean Air Act, 42 U.S.C. §§ 7401-7671q, directs the Environmental Protection Agency to establish air concentration levels above which certain pollutants may endanger public health and welfare, called National Ambient Air Quality Standards ("NAAQS"), *id*. §§ 7408-7409. On June 22, 2010 EPA exercised this authority to issue a new standard for sulfur dioxide, $SO_2$. 75 Fed. Reg. 35,520/1. The new NAAQS imposes a 1-hour ceiling of 75 parts per billion, based on the 3-year average of the annual 99th percentile of 1-hour daily concentrations. *Id*. (Because the stringency of the changes derives largely from the ways in which compliance is calculated rather than from the raw concentration numbers, it is almost impossible to give a meaningful statement of the degree by which the standard increased stringency. See Sulfur Dioxide ($SO_2$) Primary Standards – Table of NAAQS, http://www3.epa.gov/ttn/ naaqs/standards/so2/s_so2_history.html.) States were then to develop state implementation plans ("SIPs") to guide them in imposing requirements on pollution sources in order to implement the NAAQS. 42 U.S.C. §§ 7502(c), 7503(a).

Within two years after a new NAAQS is established (extendable as in this case to three for want of adequate data), *id*. § 7407(d)(1)(B)(i), EPA must designate all parts of the country as being in "attainment," in "nonattainment," or "unclassifiable" with respect to the air quality standards, *id*. § 7407(d)(1)(A). "Nonattainment" areas either fail to satisfy the NAAQS themselves or contribute to pollution in another area that does not satisfy the NAAQS. "Attainment" areas both satisfy the NAAQS and do not contribute to nonattainment status for another area. In "unclassifiable" areas, EPA lacks adequate information to make a determination either way. *Id*. § 7407(d)(1)(A)(i)-(iii).

On August 5, 2013 EPA designated 29 areas as not meeting its new $SO_2$ standards. Air Quality Designations for the 2010 Sulfur Dioxide ($SO_2$) Primary National Ambient Air Quality Standard, 78 Fed. Reg. 47,191/3 ("Final Rule"). Each of the two petitioners now before us, Treasure State Resource Industry Association and United States Steel Corporation, challenges one of these 29 designations: the Association attacks the one for part of Yellowstone County, Montana, and U.S. Steel challenges the one for part of Wayne County, Michigan. Each sought reconsideration by EPA, unsuccessfully. 79 Fed. Reg. 18,248/3 (Apr. 1, 2014); 79 Fed. Reg. 50,577/3 (Aug. 25, 2014).

We deny the petitions for review. Except insofar as both are attacks on EPA's August 2013 designations with respect to the 2010 $SO_2$ NAAQS, the two claims have virtually nothing in common. We take Montana first, then Michigan.

* * *

The Association is "a trade association comprised of natural resource industries and associations, labor unions, consulting firms and law firms, and recreation organizations

located throughout Montana." Petitioners' Br. iii. Its standing is clear and uncontested; its members are located within the nonattainment area and are subject to regulations resulting from the designation. The Association's primary arguments are: (1) that the data on which EPA relied were so unreliable that its reliance was arbitrary and capricious, 42 U.S.C. § 7607(d)(9)(A), and (2) that EPA's application of the Act was retroactive within the meaning of *Landgraf v. U.S.I. Film Products*, 511 U.S. 244 (1994), and thus, there being no clear congressional intent to authorize retroactivity, not in accord with the statute.

The Association claims that EPA failed to follow its regulations because Montana, which collected the monitoring data, had an "outdated" Quality Assurance Project Plan ("QAPP") for data collection. In particular, EPA regulations require that states have a QAPP that

> ensure[s] that the monitoring results: (a) Meet a well-defined need, use, or purpose; (b) Provide data of adequate quality for the intended monitoring objectives; (c) Satisfy stakeholder expectations; (d) Comply with applicable standards specifications; (e) Comply with statutory (and other) requirements of society; and (f) Reflect consideration of cost and economics.

40 C.F.R. § Pt. 58, App. A. Although the Association says that Montana's QAPP was "outdated" because it was developed in 1996, it identifies only one respect in which Montana's failure to adjust the QAPP might have undermined its usefulness or accuracy. Specifically it claims that the 1996 QAPP was aimed at an obsolete NAAQS standard, seeking "to measure a standard set at more than six times the 2010 $SO_2$ NAAQS and [it therefore] contains sub-optimal equipment settings, range levels, and monitoring guidance" for measuring satisfaction of the new NAAQS. Petitioners'

Br. 22. We can easily imagine a situation where a calibration aimed at a different ambient pollution level would lead to such questionable readings that agency acceptance of the data would be arbitrary and capricious. But the Association presents no evidence that the calibration to a prior standard here has actually led, or was likely to lead, to faulty measurement. In fact the record points the other way. Montana conducted numerous audits of the monitor at levels lower than the new standard, which showed the monitor's ability to record data properly at that level. There was nothing unreasonable in EPA's determination that the data from the monitor were "robust enough to be reliable" for the 2010 NAAQS. Responses to Significant Comments on the State and Tribal Designation Recommendations for the 2010 Sulfur Dioxide National Ambient Air Quality Standards (NAAQS) (July 2013) ("Responses to Comments") at 45, Joint Appendix ("J.A.") 431.

The Association's last data-quality claim is that EPA inappropriately applied a "weight of evidence" standard in its evaluation of the air quality monitoring data. Specifically, it says, EPA's regulation requiring use of the "weight of evidence" was promulgated only weeks before comments were due on EPA's proposed $SO_2$ designations and well after issuance of the new NAAQS standard. 78 Fed. Reg. 3,086, 3,283/3-3,284/1 (Jan. 15, 2013). Given this timing, the Association claims that the use of the new "weight of evidence" standard was post hoc. But in its response to the Association's petition for reconsideration EPA observed that in promulgating the standard it had merely codified its long-established practice in review of data quality, EPA Denial Letter to Treasure State at 6, J.A. 302, and the Association offers only lame arguments to refute that contention.

As to retroactivity, the Association's argument turns on the fact that EPA used data from as far back as 2009 to make

the nonattainment designation under the June 2010 $SO_2$ NAAQS regulation. Thus it imposed special regulatory burdens on parties in Yellowstone County as a direct result of activities that took place in 2009, and the first half of 2010, before promulgation of the June 2010 NAAQS rule. The regulatory burdens do not flow instantly from the nonattainment designation, but they flow ineluctably. Designation of an area as nonattainment triggers an obligation for the state within which the area is located to modify its SIP (or create one), with the goal of bringing the area into attainment. To that end the SIP must require "all reasonably available control measures as expeditiously as practicable (including such reductions in emissions from existing sources in the area as may be obtained through the adoption, at a minimum, of reasonably available control technology)." 42 U.S.C. § 7502(c)(1). And the SIP also must impose special permitting requirements on firms proposing construction of a new source or modification of an existing one, *id*. § 7502(c)(5); the new or modified source must comply "with the lowest achievable emission rate," *id*. § 7503(a)(2). Thus the challenged nonattainment designation leads to a regulatory burden on parties in nonattainment areas such as the Association's members.

The Act and EPA's enforcement strategy made it highly likely that data pre-dating the final adoption of the new NAAQS would be critical in causing some areas to be designated nonattainment and to incur those burdens. Combining to make that probable are (1) EPA's decision to measure compliance with the new NAAQS standard by a 3-year average of various 1-hour readings, (2) the requirement that EPA make its final designations within three years of promulgation, 42 U.S.C. § 7407(d)(1)(B)(i), and (3) conventional process delays and a general desire to use full calendar years. The Association does not, however, challenge the three-year averaging rule itself. Rather, it attacks the

actual designation in August 2013, which because of these features in fact drew on data antedating the new NAAQS standard.

The Supreme Court will refuse "to give retroactive effect to statutes burdening private rights unless Congress ha[s] made clear its intent." *Landgraf*, 511 U.S. at 270. (The due process clause also may place limits on retroactive burdens, see, e.g., *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976), but is not in play here.) We have already found, in a case involving a party's attempt to have a nonattainment designation made effective before EPA actually issued the designation, that the sections of the Act relating to nonattainment "contain no language suggesting that Congress intended to give EPA the unusual ability to implement rules retroactively." *Sierra Club v. Whitman*, 285 F.3d 63, 68 (D.C. Cir. 2002).[1] Thus a finding that EPA's Final Rule had retroactive effect (within the meaning of *Landgraf*) would render it impermissible under the attainment designation provisions of the Act.

Although *Landgraf* requires that courts evaluating a rule for retroactivity ask "whether the new provision attaches new legal consequences to events completed before its enactment," that is far from the end of the story; "[a] statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment." 511

---

[1] Furthermore, the APA prohibits retroactive rulemaking. See *Georgetown Univ. Hosp. v. Bowen*, 821 F.2d 750, 756-58 & n.11 (D.C. Cir. 1987), *aff'd*, 488 U.S. 204 (1988) (citing 5 U.S.C. § 551(4), defining a "rule" as "an agency statement of general or particular applicability and *future effect*" (emphasis added)). We said in *Celtronix Telemetry, Inc. v. FCC*, 272 F.3d 585, 588 (D.C. Cir. 2001), that the "tests formulated in *Landgraf* are indeed pertinent to the APA issue."

U.S. at 269-70. The most concrete factors are "considerations of fair notice, reasonable reliance, and settled expectations," *id*. at 270 (citations omitted), to which we now turn.

The typical form of unfairness that retroactivity may wreak is by radically undermining the value of costs that parties incurred in reasonable reliance on continuation of the status quo, or by discouraging parties from incurring costs that by virtue of the new rule might have yielded net savings. An example of the first would be decisions to build or improve a plant for compliance with the old standards—changes that as a result of the new rule and the nonattainment designation may require costly retrofitting. A cost that knowledge of the new rule and nonattainment classification might have encouraged would be building to the resulting specifications—again in order to avoid retrofitting costs that would stem from an improvement that complied merely with the old regulatory landscape. (A further advantage would have been the chance of avoiding nonattainment designation—and its attendant regulatory entanglement—by improving the area's overall air quality, but it's hard to imagine a single source owner's employing such a strategy, which could easily be undermined by the conduct of other source owners.) Here, in fact, the record discloses no evidence of Yellowstone County source owners' taking any such steps in reliance on the old standards.

The absence of such evidence is hardly surprising in light of the established rules governing nonattainment designation and the ample public notice of the impending change in the NAAQS. The Act itself requires that "at five-year intervals . . . , the [EPA] Administrator shall complete a thorough review of" the NAAQS and revise them as appropriate. 42 U.S.C. § 7409(d)(1). Moreover, these changes have moved generally toward greater stringency over the life of the Act. See links to historical NAAQS standards at http://www3.epa.gov/ttn/naaqs/criteria.html. More

specifically, EPA had long given notice of the prospect of more stringent $SO_2$ regulations. (See the review of the history in 75 Fed. Reg. at 35,522/2-35,523/3.) As early as 1988, it requested public comment on a new 1-hour standard similar to the one that was adopted in 2010. 53 Fed. Reg. 14,926/1 (Apr. 26, 1988). In 1998, this court held that a later decision not to revise the standards had been inadequately reasoned. *American Lung Association v. EPA*, 134 F.3d 388 (D.C. Cir. 1998). EPA embarked on further data collection, and in 2006 initiated the review of its $SO_2$ air quality criteria, 71 Fed. Reg. 28,023/2 (May 15, 2006), a review that culminated in the 2010 standards. While of course divining the specifics of EPA's decision would have been impossible, firms had years of notice that more stringency was possible. Accordingly, any investment decisions taken in the expectation of stasis would not have qualified as having been made in reasonable reliance on preexisting law.

Finally, the Association challenges EPA's denial of its reconsideration petition. 79 Fed. Reg. 50,577/3. Its main argument in its petition for reconsideration was that if EPA had considered new data from 2013 it would have found that Yellowstone County was no longer out of attainment. Petition for Reconsideration or Repeal of a Portion of the Final Rule and Request for an Administrative Stay Pending Agency Proceedings at 7-8, J.A. 332-33. There are at least two problems with this claim. First, the 2013 data were not complete or certified at the time that the Association suggested that they be used. *Id*. at 6 n.28. And using only data for 2010-2012 would not have undone the county's violation of the NAAQS. Responses to Comments at 51, J.A. 437.

Second, a ruling that an agency's disregard of data gathered after final agency action was arbitrary and capricious could make it difficult for many actions to go into effect.

Since new data may continue to pour in, reconsideration based on such data could materially delay arrival at a final decision. And the Act clearly did intend to produce final rules, since "Congress imposed deadlines on EPA and thus clearly envisioned an end to the designation process." *Catawba County, N.C. v. EPA*, 571 F.3d 20, 51 (D.C. Cir. 2009). Further, parties in areas designated nonattainment aren't without recourse: Congress explicitly provided a re-designation process in 42 U.S.C. §§ 7407(d)(3), 7505a. Rejecting the petition for reconsideration, EPA explained this recourse, as well as the possibility of submitting a request for a "clean data determination," which "would suspend certain nonattainment planning requirements." Treasure State Den. Ltr. at 22-23, J.A. 318-19. Given the difficulties arising from reconsideration of new data and the availability of other avenues of redress, it was reasonable for EPA to deny reconsideration of this claim.

The Association's remaining arguments, alleging data quality deficiencies that it claims the agency ignored in finalizing the Montana designation, were not specifically raised until reconsideration and were then fully and reasonably disposed of by EPA in its denial.

We therefore uphold the Final Rule's designation of part of Yellowstone County as nonattainment.

\* \* \*

We turn now to the Michigan designation. U.S. Steel has a plant located in the nonattainment portion of Wayne County and does not dispute the designation of that portion as nonattainment. But it argues that it was not reasonable for EPA to designate part of Wayne County as nonattainment without simultaneously making the same determination for at least that portion of neighboring Monroe County that includes

the Monroe Coal-Fired Power Plant (the "Monroe plant"). Pointing to the statutory criteria for nonattainment designation, § 107(d)(1)(A)(i), 42 U.S.C. § 7407(d)(1)(A)(i), which require inclusion of any area "that contributes to ambient area quality in a nearby area that does not meet" the NAAQS, U.S. Steel says that $SO_2$ from the Monroe plant significantly contributes to $SO_2$ levels in Wayne County and that therefore designation of Wayne County without the Monroe plant violates the statute and is arbitrary and capricious.

U.S. Steel must first establish its standing by showing satisfaction of the now-standard elements of injury in fact, causation and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Once we understand the process for remedying nonattainment in an area so designated, it is apparent that U.S. Steel meets those requirements.

U.S. Steel has suffered an injury in fact that is "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical,'" *id.* at 560 (citations omitted), because the designation of Wayne County as nonattainment without the inclusion of the Monroe plant area subjects it to a markedly higher risk of facing costly (or more costly) regulatory pollution controls. EPA claims that there is little risk of such an injury, since Michigan can elect to address nonattainment in Wayne County by "impos[ing] emission reduction requirements on all facilities that it determines are, in fact, contributing to nonattainment." Respondents' Br. 40. Thus, says EPA, the burden of reducing pollution could be shared between U.S. Steel and the Monroe plant regardless of whether the Monroe plant is included in the nonattainment area. EPA's contention is a considerable oversimplification.

The Act gives a kind of primacy to reductions from sources in the nonattainment area itself, and we have read it as

sharply prioritizing reductions inside the nonattainment area. Speaking of the SIP required for a nonattainment area, the Act provides:

> (1) In general
>
> Such plan provisions shall provide for the implementation of all reasonably available control measures as expeditiously as practicable (including such reductions in emissions from existing sources in *the area* as may be obtained through the adoption, at a minimum, of reasonably available control technology) and shall provide for attainment of the national primary ambient air quality standards.

Act, § 172(c)(1), 42 U.S.C. § 7502(c)(1) (emphasis added).

We considered this provision in *NRDC v. EPA*, 571 F.3d 1245 (D.C. Cir. 2009), where we reviewed an EPA rule defining state SIP obligations for $NO_x$ over a 22-state region and instituting a cap-and-trade program throughout the region. Besides relying on the language of the parenthetical clause in § 172(c)(1), NRDC had expressed concern that EPA's rule allowed states to rely on sources not only outside nonattainment areas but also on sources "in other states hundreds of miles away." Final Opening Brief of Natural Resources Defense Council at 21, *NRDC*, 571 F.3d 1245 (No. 06-1045). We ruled that the parenthetical "calls for reductions in emissions from sources in the area; reductions from sources outside the nonattainment area do not satisfy the requirement." *Id*. at 1256. And we went on to say that satisfaction of § 172(c)(1)'s "reasonably available control technology" ("RACT") mandate must "entail[] at least RACT-level reductions in emissions from sources within the nonattainment area." *Id*. Thus, if Monroe County were designated nonattainment (and if it is a significant enough

contributor, as U.S. Steel claims), then the Monroe plant would be subject to RACT; without such designation, any state pressure for cutbacks at the Monroe plant would be up to Michigan (acting, of course, within the constraints of the Act). And, while Michigan *could* impose restrictions on the Monroe plant, as EPA assures us, under *NRDC* the resulting reductions would "not satisfy the [§ 172(c)(1) RACT] requirement." *Id.*

Given that understanding of § 172(c)(1), it might seem that the cutbacks likely to be imposed on U.S. Steel will be the same regardless of whether the Monroe plant is included in the nonattainment area. But EPA's concept of RACT is such that inclusion of the Monroe plant (again assuming that its contribution to $SO_2$ exceedances in Wayne County is significant) would likely reduce the stringency of the RACT imposed on U.S. Steel. RACT takes into account "[t]he necessity of imposing such controls in order to attain and maintain a national ambient air quality standard." 40 C.F.R. § 51.100(o)(1) (2009). Indeed, in its response to comments on the regulation targeting U.S. Steel's $SO_2$ emissions, the State of Michigan cites this definition. Proposed SIP, Appendix F: Draft Rule 430 Comments/Responses at 1-2, http://www.deq.state.mi.us/aps/downloads/SIP/SO2SIP.pdf. Thus, expansion of the nonattainment area to include another seriously contributing source would likely reduce the severity of the RACT imposed on U.S. Steel; conversely, EPA's failure to add the Monroe plant area inflicts a substantial risk of more severe controls on U.S. Steel, an imminent and non-hypothetical injury, redressable by a mandate to include that area.

EPA also argues that its Final Rule is not final within the meaning of the APA, 5 U.S.C. § 704, with respect to this challenge, because it expressly said that it had not completed the designation process for Monroe County. Michigan Technical Support Document at 7-8, J.A. 655-56. But this

misconceives U.S. Steel's claim, which, to repeat, is that it was unlawful to designate Wayne County without simultaneously designating the area containing the Monroe plant.

Reaching the merits, however, we find neither a violation of the Act nor any arbitrariness in EPA's action. For its $SO_2$ rulemaking, EPA issued guidance to the states for making their initial recommendations, indicating that "the perimeter of a county containing a violating monitor would be the initial presumptive boundary for nonattainment areas." 78 Fed. Reg. at 47,195/2. Nothing in the Act or its associated regulations prevents EPA from presumptively following county boundaries. Recall that the Act defines a nonattainment area as "any area that does not meet (or that contributes to ambient air quality in a nearby area that does not meet) the national primary or secondary ambient air quality standard for the pollutant." 42 U.S.C. § 7407(d)(1)(A)(i). Assuming that the portion of Monroe County containing the Monroe plant may ultimately be found to contribute to nonattainment in Wayne County, nothing in the definition requires a simultaneous decision on both counties. (Nor does it require that a single area be created. At oral argument EPA counsel told the court that in the event of a later nonattainment designation of the Monroe plant area because of its contributions to Wayne County, "the measuring would ultimately be a collective one of [whether] these counties collectively brought [non]attainment at the monitoring site in Wayne County." Oral Argument at 58:27.)

Of course, EPA's approach could still be arbitrary and capricious even in the absence of a statutory or regulatory mandate. Under the APA, EPA must "conform to 'certain minimal standards of rationality.'" *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 521 (D.C. Cir. 1983). But EPA has offered many reasons that justify its decision to

defer a decision on Monroe County. Most importantly, there was uncertainty over whether pollution from Monroe County is, in fact, substantially contributing to air quality in Wayne County. The Monroe plant is approximately 54 kilometers away from the violating Wayne County monitor. Responses to Comments at 27, J.A. 413; Michigan Technical Support Document at 6, J.A. 654. Additionally, another monitor located between the Monroe plant and the violating Wayne County monitor—and significantly closer to the former than to the latter—showed no exceedances. Responses to Comments at 28, J.A. 414. Finally, EPA reasonably asserted the need for further study on the effect of recently-installed emission control scrubbers on the Monroe plant. Michigan Technical Support Document at 6, J.A. 654. Given the current uncertainty, postponement of the classification of Monroe County was not arbitrary and capricious.

Finally, U.S. Steel's challenge to the denial of its petition for reconsideration fails. In denying that petition, EPA thoroughly and reasonably addressed U.S. Steel's arguments. See EPA Denial Letter to U.S. Steel, J.A. 598-610.

* * *

The petitions for review of the Final Rule and EPA's denial of petitions for reconsideration are accordingly

*Denied.*