# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 11, 2018      Decided October 19, 2018

No. 16-1314

SAMUEL MASIAS, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY AND ANDREW
WHEELER, ACTING ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENTS

UNION ELECTRIC COMPANY AND UTILITY AIR REGULATORY
GROUP,
INTERVENORS

———

Consolidated with 16-1318, 16-1384

———

On Petitions for Review of an Action of the
United States Environmental Protection Agency

———

*Robert Ukeiley* argued the cause and filed the briefs for petitioners Samuel Masias, et al.

*Lisa K. Perfetto* argued the cause for petitioner Sierra Club. With her on the briefs were *Thomas J. Cmar* and *Joshua D. Smith*.

*Dennis Lane* argued the cause and filed the briefs for petitioner Kansas City Board of Public Utilities.

*Amanda Shafer Berman*, Attorney, U.S. Department of Justice, argued the cause for respondents. With her on the brief was *Jonathan D. Brightbill*, Deputy Assistant Attorney General. *John C. Cruden* entered an appearance.

*Lucinda Minton Langworthy* argued the cause for respondent-intervenors. With her on the brief were *Renee Cipriano*, *J. Michael Showalter*, and *Aaron M. Flynn*.

Before: TATEL and MILLETT, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: This case arises out of the Environmental Protection Agency's designation of 61 areas under the National Ambient Air Quality Standard for sulfur dioxide. In these consolidated cases, industry and environmental petitioners challenge EPA's determination that it could not, on the basis of "available information," classify three of the 61 areas as meeting or not meeting the air quality standard, and that it must therefore designate them as "unclassifiable." For the reasons below, we dismiss or deny the petitions for review.

3

* * *

The Clean Air Act, 42 U.S.C. §§ 7401–7671q, directs EPA to set the maximum permissible concentration of certain pollutants in the ambient air. These standards are called National Ambient Air Quality Standards, or NAAQS. *Id*. §§ 7408–7409. Once EPA promulgates a new NAAQS for a given pollutant, states are to submit lists designating all areas in the state as being in "attainment," in "nonattainment," or "unclassifiable" with respect to that standard. *Id*. § 7407(d)(1)(A). "Nonattainment" areas are ones that violate the NAAQS or contribute to NAAQS violations in a nearby area; "attainment" areas meet the NAAQS; and "unclassifiable" areas are those which cannot be classified on the basis of "available information." *Id*. § 7407(d)(1)(A)(i)–(iii). EPA itself either promulgates the states' designations or modifies them as appropriate; the agency also makes its own designations when a state fails to do so. *Id*. § 7407(d)(1)(B)(i)–(ii). (EPA uses its own label—"unclassifiable/attainment"—for areas that are "attainment" or "likely attainment." 81 Fed. Reg. 45,039, 45,041/3 n.3 (July 12, 2016). But as there is no practical difference between "attainment" and "unclassifiable/attainment," we use the simpler, congressionally created category throughout this opinion.)

Issuance of a new NAAQS also triggers a state duty to adopt plans for implementing, maintaining, and enforcing that air quality standard. *Id*. § 7410(a). These state implementation plans, or SIPs, provide a blueprint for imposing controls on pollution sources. *Id*. §§ 7502(c), 7503(a). For areas that EPA designates as "attainment" or "unclassifiable," SIPs must "prevent significant deterioration of air quality." *Id*. § 7471. For areas that EPA designates as "nonattainment," SIPs must go further, and strive for attainment of the air quality standard "as expeditiously as practicable . . . ." *Id*. § 7502(a)(2)(A), (c).

On June 22, 2010, EPA issued a new standard for sulfur dioxide, or $SO_2$. 75 Fed. Reg. 35,520 (June 22, 2010). The new $SO_2$ NAAQS imposed a ceiling of 75 parts per billion, based on the three-year average of the annual 99th percentile of 1-hour daily maximum concentrations. *Id*. at 35,520/1. Having issued one round of area designations in 2013, EPA issued a second round in 2016, designating 61 areas in 24 states. 81 Fed. Reg. at 45,040/3.

Each of the three petitioners now before us challenges one of those 61 designations. Petitioner Kansas City Board of Public Utilities challenges EPA's designation of Wyandotte County, Kansas; petitioner Sierra Club objects to EPA's designation of Gallia County, Ohio; and petitioners Samuel Masias et al. take issue with EPA's designation of Colorado Springs, Colorado. (The areas at issue do not map exactly onto the legally designated boundaries of the political entities, see *id*. at 45,046, 45,049, 45,053, but we use the simplifying labels applied by the parties.)

In reviewing these challenges, "we apply the same standard of review . . . as we do under the Administrative Procedure Act," *Nat'l Envtl. Dev. Association's Clean Air Project v. EPA*, 891 F.3d 1041, 1047 (D.C. Cir. 2018) (quoting *Allied Local & Regional Mfrs. Caucus v. EPA*, 215 F.3d 61, 68 (D.C. Cir. 2000)), "and we will affirm EPA's action 'if the record shows EPA considered all relevant factors and articulated a rational connection between the facts found and the choice made,'" *Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1018 (D.C. Cir. 2016) (internal quotation marks omitted) (quoting *Catawba Cnty. v. EPA*, 571 F.3d 20, 41 (D.C. Cir. 2009)).

For the reasons below, we dismiss the Board's petition for lack of standing and deny Sierra Club's and Masias's petitions

on the merits.  We take the Board's petition first, then those of Sierra Club and Masias.

\* \* \*

For a power plant operator, the Board's claim is unusual. We typically hear that EPA improperly designated an area as "nonattainment" and thus subjected a regulated party to costly (or more costly) pollution controls.  In such cases, standing is "clear" and usually "uncontested."  See, e.g., *Treasure State Res. Indus. Ass'n v. EPA*, 805 F.3d 300, 303 (D.C. Cir. 2015).

Not so here.  Because EPA designated Wyandotte County as "unclassifiable," the Board does not—and cannot—claim that it was subjected to regulatory burdens beyond those applicable under the Board's preferred designation— "attainment."    The statute requires that SIPs for areas designated attainment or unclassifiable *alike* include measures to "prevent significant deterioration of air quality."  42 U.S.C. § 7471.   That's all.   Thus the statutory burdens (and the regulatory ones, see, e.g., 40 C.F.R. § 52.21(a)(2)(i)) are the same, and the Board cannot point to a heavier regulatory burden resulting from EPA's failure to make what the Board claims is the legally correct choice. *Catawba Cnty. v. EPA*, No. 05-1064, slip op. at 2 (D.C. Cir. July 7, 2009) (unpublished); see also, e.g., *Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138, 145 (D.C. Cir. 2015); *BP Cherry Point*, 12 E.A.D. 209, 230 n.51 (EAB 2005).  In these circumstances, the Board appears to meet no part of the familiar threefold standing requirement— that it has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable decision.  See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 14 (D.C. Cir. 2011).

Given the lack of any difference in the legal obligations flowing from either designation, the Board argues that the "unclassifiable" designation subjects it to more "uncertainty" as to whether Wyandotte County was actually in attainment at the time of EPA's designation than an attainment designation would have. Board's Br. 17. That matters, the Board says, because it signals a difference in the risk of redesignation to nonattainment and all the associated burdens. An "attainment" designation, it believes, would "offer[] a high level of certainty that Wyandotte County had already achieved NAAQS compliance," and "thus minimiz[e] the threat" that EPA would later redesignate the area as nonattainment. Board's Reply Br. at 7–8; see also Oral Argument at 24:40.

But the Board offers neither evidence nor reason to believe that an "attainment" designation would impact EPA's future actions or in any way make a "nonattainment" redesignation less likely or less imminent. By statute EPA can "*at any time*" redesignate the area, 42 U.S.C. § 7407(d)(3)(A) (emphasis added); even without new information, EPA can change course with nothing more than a "reasoned explanation," see, e.g., *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 626 (D.C. Cir. 2016); *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1037–38 (D.C. Cir. 2012); *Arkema, Inc. v. EPA*, 618 F.3d 1, 6 (D.C. Cir. 2010). See Oral Argument at 20:15 (Court: "But it is the case that . . . in either of these categories, the EPA is free at any time, on its own motion, to re-examine . . . the classification?" Board Counsel: "Absolutely, Your Honor.").

Even though EPA has the same statutory authority to redesignate both "unclassifiable" and "attainment" areas ("at any time"), it might be the case that as a practical matter EPA redesignates "unclassifiable" areas at a higher rate. If that were true, perhaps the Board could rest standing on a "substantially increased" risk of imminent "regulation or enforcement." *Nat'l Ass'n of Home Builders*, 667 F.3d at 14. The Board, however,

offers no facts to support such a claim. *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 379 (D.C. Cir. 2017) (citing *Lujan*, 504 U.S. at 561); see Oral Argument at 26:04 (Court: "[A]re there any empirical data on the frequency of EPA moves to change on the one hand an unclassifiable designation and on the other hand an [unclassifiable / attainment designation]?" Board Counsel: "If there are, I don't know.").

In a similar vein the Board suggests that the State of Kansas would "most likely" respond to the "unclassifiable" designation by imposing "new controls" in Wyandotte County. Board's Reply Br. 6. Why so? The Board offers no more support for this prediction than it did for the likelihood of EPA redesignation. This is not one of those cases where a federal determination "alters the legal regime" in such a way as to create a significant likelihood of a state action adverse to the complaining party's interests. Cf. *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 6–7 (D.C. Cir. 2005) (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)).

Finally, the Board expresses concern that finding no standing here would eliminate all review because EPA "always" has authority to redesignate "*any* area under *any* designation." Board's Reply Br. 8–9. This is, unfortunately for petitioner, nonsense. Normally challengers of a designation rest their standing on the way in which its regulatory consequences harm them in comparison with a designation they claim to be legally or factually required—typically industry challenging nonattainment designations and environmentalists challenging attainment designations or (as in the two remaining cases here) unclassifiable ones. Agency authority to redesignate couldn't undermine that standing—unless it were so common as to render designations non-final. Apart from that, the assumption that if the Board has "no standing to sue, no one would have standing," would, even if true, not be a

reason in itself to find standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 420 (2013) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 489 (1982)).

In short, the Board has not demonstrated that EPA's "unclassifiable" designation, compared to the "attainment" designation the Board claims to have been required, has subjected it to any cognizable injury. We dismiss the Board's petition.

\* \* \*

We turn now to the Ohio designation. The sequence of events greatly complicates the issues. In the course of 2015 EPA received conflicting air dispersion modeling from both Sierra Club and the Ohio Environmental Protection Agency ("Ohio"), the former showing Gallia County in nonattainment, the latter showing it in attainment. See Final Technical Support Document for Final Action on Ohio Area Designations at 19–20, EPA-HQ-OAR-2014-0464-0405, J.A. 613–14; Technical Support Document: Ohio Area Designations at 28–29, EPA-HQ-OAR-2014-0464-0134, J.A. 228–29. EPA rejected both modeling sets as unreliable, a decision Sierra Club doesn't contest.

Pursuant to a March 1, 2016 order of EPA, the time for public comment on all the Round 2 designations closed March 31, 2016. See 81 Fed. Reg. 10,563, 10,564/1 (Mar. 1, 2016). Thereafter (in April 2016 but *not* barred by the close of public comments), Ohio submitted new modeling. In its final decision EPA rejected this modeling, solely (in Sierra Club's view, see Br. 19) on the ground that it had inappropriately reduced an input—$SO_2$ background concentrations—by 38%. As both the final Ohio submission and EPA's rejection occurred after the

close of comments, Sierra Club had no opportunity to respond to either.

Here Sierra Club claims that the Ohio modeling was susceptible to a "basic mathematical fix," namely restoring pollution levels that Ohio's inappropriate 38% reduction had removed. This would have resolved EPA's sole objection, says Sierra Club, and conclusively demonstrated nonattainment. See Sierra Club's Br. 16–21.

Perhaps so. But Sierra Club's is an argument for the agency, not this court—at least in the first instance. The Clean Air Act expressly limits our review to "[o]nly" those objections that were "*raised with reasonable specificity* during the period for public comment." 42 U.S.C. § 7607(d)(7)(B) (emphasis added). Because Sierra Club's objection here is based entirely on modeling that EPA received *after* the period for public comment and on EPA's even later assessment of that modeling, Sierra Club did not raise that objection during the comment period—and could not possibly have done so. Its objection therefore cannot be considered in review of this petition. See, e.g., *Nat. Res. Defense Council v. Thomas*, 805 F.2d 410, 438 (D.C. Cir. 1986) (refusing to "consider the merits of an objection to a postcomment period agency action"); *Am. Petroleum Inst. v. Costle*, 665 F.2d 1176, 1190 (D.C. Cir. 1981) (same for an objection to a study received by EPA "after the close of the comment period").

We note that EPA did not assert this bar—and are somewhat baffled by its neglect of a rule protecting it from judicial intervention over a claim that it had had no opportunity to evaluate. See *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 553 (D.C. Cir. 2015). But Respondent-Intervenors Utility Air Regulatory Group and Union Electric Company properly preserved the argument. Based on the former's supplemental submission, we find that it had associational

standing to do so.  See Letter from Lucinda Minton Langworthy (Sept. 13, 2018), Doc. No. 1750501.

In its reply brief, Sierra Club invites us to find its mathematical fix objection nestled within its March 2016 Comment, which it describes as objecting that "available information demonstrates that Gallia County is in nonattainment."  Sierra Club's Reply Br. 14; see also Letter from Zachary M. Fabish, Staff Attorney, Sierra Club to Amparo Castillo, Docket Manager, EPA (Mar. 31, 2016), J.A. 409, 419 [hereinafter Sierra Club Comment]; cf. 42 U.S.C. § 7407(d)(1)(A)(iii) (defining "unclassifiable" as "any area that cannot be classified on the basis of available information as meeting or not meeting" the NAAQS); *id*. § 7407(d)(3)(A) (authorizing EPA to redesignate an area when "available information indicates that the designation . . . should be revised").  But a mere reference to "available information" plainly cannot qualify as posing with "reasonable specificity" Sierra Club's present contention that reversing Ohio's 38% discount would lead ineluctably to a nonattainment designation—at least not if Congress's regulatory structure is to be preserved.

Moreover, when Sierra Club spoke of "available information" in its March 2016 Comment, it was apparently referring to its own modeling—not Ohio's.  See Sierra Club Comment at 11, J.A. 419.  In any event, Sierra Club necessarily meant information in EPA's hands *as of that time*—not information that would reach EPA only in April 2016.

Sierra Club had a path to judicial review of its present claim.  The Act provides an orderly process for raising objections that a party had no opportunity to press during the public comment period.  Under 42 U.S.C. § 7607(d)(7)(B), when the "grounds" for an objection "arose after the period for public comment," and the "objection is of central relevance to

the outcome of the rule," *id*., the objecting party must "petition EPA for administrative reconsideration *before* raising the issue" in this court, *EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 137 (D.C. Cir. 2015) (emphasis added).

Sierra Club's sophisticated lawyers are of course aware of this provision and in fact filed such a reconsideration petition in part to raise the group's proposed mathematical fix. Sierra Club's Br. 9. The petition quite correctly asserted that "The Grounds For [Its] Objections Arose *After* The Close Of The Public Comment Period." Letter from Tony Mendoza, Staff Attorney, Sierra Club, to Gina McCarthy, Administrator, EPA, at 2 (Jan. 6, 2017), J.A. 619 (emphasis added) (paraphrasing 42 U.S.C. § 7607(d)(7)(B)). That claim, clearly, can't be squared with Sierra Club's theory here—that its objection satisfied the statute's requirement that it have been raised "*during* the period for public comment." 42 U.S.C. § 7607(d)(7)(B) (emphasis added).

The fate of the petition for reconsideration, though not strictly relevant, deserves mention. As Sierra Club observes, "EPA purported to grant [the petition], but instead agreed only 'to evaluate *when available*, three years (calendar years 2017 through 2019) of ambient air-quality-monitoring data that will result from SO$_2$ monitors.'" Sierra Club's Br. 9 (quoting Letter from Gina McCarthy, Administrator, EPA, to Tony G. Mendoza, Staff Attorney, Sierra Club (Jan. 18, 2017), J.A. 617). Sierra Club characterizes this as a grant "in name only." Sierra Club's Reply Br. 2.

Again, perhaps so. And perhaps Sierra Club could have petitioned for review of EPA's reconsideration order by claiming that the "grant" was functionally a denial. See, e.g., *Mexichem*, 787 F.3d at 553–54. That, at least, would have properly teed up the reconsideration proceeding—the only context in which we would be entitled to consider EPA's

treatment of the 38% discount theory.  Because Sierra Club has not petitioned us to review that proceeding, however, we may not do so now.  See, e.g., *LaRouche's Comm. for a New Bretton Woods v. FEC*, 439 F.3d 733, 739 (D.C. Cir. 2006).

Finally, Sierra Club invokes a statement that has appeared in a few of our cases:  EPA "retains a duty to examine key assumptions," and therefore "must justify [those] assumption[s] even if no one objects . . . during the comment period." *Nat. Res. Defense Council v. EPA*, 755 F.3d 1010, 1023 (D.C. Cir. 2014) (quoting *Appalachian Power Co. v. EPA*, 135 F.3d 791, 818 (D.C. Cir. 1998)); see Sierra Club's Reply Br. 16.  But after a "single, conclusory" sentence, Sierra Club fails to "further develop" the argument. *United States v. TDC Mgmt. Corp.*, 827 F.3d 1127, 1130 (D.C. Cir. 2016) (quoting *Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008)).  And "it is not our practice to" finish the job ourselves. *Am. Freedom Defense Initiative v. Wash. Metro. Transit Auth.*, 901 F.3d 356, 369 n.6 (D.C. Cir. 2018); see also *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work . . . .  [A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990))).

In sum, we hold that Sierra Club's sole objection was not "raised . . . during the period for public comment." 42 U.S.C. § 7607(d)(7)(B).  And although Sierra Club did raise that objection in a petition for reconsideration, EPA's resolution of that petition is not before us.  We thus deny Sierra Club's petition for review.

13

* * *

Finally we consider EPA's "unclassifiable" designation for Colorado Springs. During the comment period, EPA received modeling purporting to show the area in nonattainment. But EPA rejected that modeling, which was based on meteorological data from the Colorado Springs Airport. EPA explained that such data were not representative of the area around the Martin Drake Power Plant, the main emissions source in Colorado Springs. For that reason, EPA said, models based on the airport meteorological data could not reliably inform the agency's designation. See Final Technical Support Document: Colorado at 15–19, 23, EPA-HQ-OAR-2014-0464-0393, J.A. 557–61, 565 [hereinafter Colorado Final Technical Support].

Masias sees things differently. He argues that EPA arbitrarily failed to "define representative in any way." Masias's Br. 22; see also Masias's Reply Br. 3. And he faults the agency for applying different standards of representativeness in different areas. See Masias's Br. 22–23. Neither argument prevails.

Masias's first contention runs headlong into EPA's guidelines for air quality modeling. These provide that "meteorological data used as input . . . should be selected on the basis of spatial and climatological (temporal) representativeness." 40 C.F.R. pt. 51, App. W § 8.4(b). The guidelines then explain how EPA assesses "representativeness":

The representativeness of the measured data is dependent on numerous factors including, but not limited to: (1) The proximity of the meteorological monitoring site to the area under consideration; (2) the complexity of the terrain; (3)

> the exposure of the meteorological monitoring site; and (4) the period of time during which data are collected.

40 C.F.R. pt. 51, App. W § 8.4(b); see also $SO_2$ NAAQS Designations Modeling Technical Assistance Document at 26 (draft Feb. 2016), J.A. 321.

EPA reasonably applied those guidelines here. See Colorado Final Technical Support at 13, J.A. 555. The agency identified significant differences in terrain and wind patterns between the airport and the Drake plant. With respect to terrain, the agency reasonably noted that the elevation near the airport (about 600 feet) was "moderate" when compared to the elevation—owing to the Rocky Mountains—near the Drake plant (about 4000 feet). *Id*. at 16 & n.4, J.A. 558.

These differences in terrain, EPA further found, drove differences in wind speeds and directions. Specifically, winds at the Drake plant, following the Fountain Creek Valley, predominantly flow northwest and southeast, whereas winds at the airport, "driven by the higher terrain to the north," mostly flow north and south, *id*., as shown here:



*Id*. at 16 fig.4, J.A. 558. Similar differences in direction, not to mention speed, can be seen, the agency concluded, through a comparison of meteorological data collected at both sites, as shown in the following figures (known as wind roses):



Meteorological Data from Drake Plant



Meteorological Data from Colorado Springs Airport

*Id.* at 17–18 figs.5–6, J.A. 559–60.

All in all, these differences, EPA explained, would "significantly impact the transport and dispersion conditions of [SO$_2$] plumes" in both areas. Responses to Significant Comments on the Designation Recommendations for the 2010 Sulfur Dioxide Primary National Ambient Air Quality Standard (NAAQS) at 21, EPA-HQ-OAR-2014-0464-0389 (June 30, 2016), J.A. 518 [hereinafter Responses to Significant Comments]. On that basis, the agency concluded that the meteorological data from the airport were not representative of the Colorado Springs area and, accordingly, could not provide an appropriate basis for the agency's designation. *Id*.; see also Colorado Final Technical Support at 19, J.A. 561.

In short, EPA reasonably relied on a multi-factor test to reject the data here. As we have observed in a related context, "discrete data points are not determinative" because, by its "very nature," a multi-factor test "is designed to analyze a wide variety of data on a case-by-case basis." *ATK Launch Sys., Inc. v. EPA*, 669 F.3d 330, 336 (D.C. Cir. 2012) (internal quotation marks omitted) (quoting *Catawba Cnty.*, 571 F.3d at 46). Thus, it is "EPA's holistic assessment of numerous factors [that] drives the process—no single factor determines a particular designation." *Id*. (quoting *Catawba Cnty.*, 571 F.3d at 46).

Masias also claims that "EPA used a different standard for judging representativeness of meteorological data for Colorado Springs versus" four other areas. Masias's Br. 22. But only a fragment of that theory was raised before the agency; we review the fragment and find it wanting.

As already noted at some length, the act limits our review to "[o]nly" those objections that were "raised with reasonable specificity during the period for public comment." 42 U.S.C. § 7607(d)(7)(B). Although Masias need not have *personally* raised his current objection during the comment period, see *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 948 n.12

(D.C. Cir. 2004), he must point us to a commenter who did, see Fed. R. App. P. 28(a)(8)(A) (requiring briefs to contain citations to "parts of the record" relied upon). That commenter must have stated Masias's current objection in a "clear enough" way to have "place[d] the agency 'on notice.'" *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1231 (D.C. Cir. 2007) (quoting *Mossville Envtl. Action Now v. EPA*, 370 F.3d 1232, 1240 (D.C. Cir. 2004)).

Here, Masias relies on a single sentence from a 14-page expert report. See Masias's Reply Br. 10. In that report Dr. H. Andrew Gray argued that the Colorado Springs Airport data were sufficiently representative of the Colorado Springs area. See Expert Report and Statement of Dr. H. Andrew Gray at 8–14 (Mar. 30, 2016), J.A. 367–73. On the tenth page of that report, he noted in passing EPA's different treatment of meteorological data from different areas. He claimed that it "is common" to use "surface meteorological data . . . that are from airports located much further away" from the emissions source than the Colorado Springs Airport. *Id*. at 10, J.A. 369. At no point, though, did Dr. Gray bring any specific areas to EPA's attention or draw contrasts based on any factor other than proximity.

We take Dr. Gray's comment to adequately raise the objection that EPA's weighing of the *proximity* of meteorological data for Colorado Springs differed from its weighing of proximity for other areas. EPA addressed this comment head on. The agency "agree[d] that it is acceptable in some cases to use meteorological data collected at an airport . . . that may be located a significant distance from the modeled source." Responses to Significant Comments at 31, J.A. 528. But EPA also explained that it had relied on such distant airport meteorological data where the data, overall, were "representative of the meteorological conditions at the location of the modeled source," and that this was not so for the airport

and power plant here. *Id.* The finding of representativeness in other instances rested, EPA said, on the multi-factor test described above, which, as applied to Colorado Springs, militated against finding the airport data representative. See *id.*; Colorado Final Technical Support at 13–19, J.A. 555–61.

Because "EPA is not required 'to cull through all the letters it receives and answer all of the possible implied arguments,'" *Nat'l Ass'n of Clean Air Agencies*, 489 F.3d at 1231 (quoting *Mossville*, 370 F.3d at 1231), Dr. Gray's argument (the only one adduced by Masias as raising his broad claim) did not put the agency on notice that it needed to defend its weighing of other factors, such as terrain and wind speeds, across different areas. Our finding that EPA adequately addressed Dr. Gray's concern therefore disposes of Masias's claim of agency inconsistency across sites.

We therefore deny Masias's petition for review.

\* \* \*

For the foregoing reasons, we dismiss the Board's petition for lack of standing and deny Sierra Club's and Masias's petitions for review.

*So ordered.*